IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-03229-REB-MJW

HEALTHTRIO, LLC, a Colorado limited liability company,

Plaintiff,

v.

AETNA, INC., a Connecticut corporation,
ACTIVEHEALTH MANAGEMENT, INC., a Delaware corporation, and
MEDICITY, INC., a Colorado corporation,

Defendants.

## REPORT & RECOMMENDATION ON DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS (Docket No. 185)
### and

## ORDER ON PLAINTIFF'S MOTION FOR LEAVE TO FILE A SUR-REPLY (Docket No. 205)

**Michael J. Watanabe**
**United States Magistrate Judge**

The case is about electronic healthcare records.   Plaintiff has a system for aggregating and normalizing patient records from multiple medical providers; Defendants do, too.   The question in the overall case is whether Defendants' system infringes on the patents protecting Plaintiff's system.   The question in this *motion* is whether the whole idea is too abstract to be patented in the first place.   Because the claims at issue are drawn to the abstract idea of organized recordkeeping, and because Plaintiff's insight (that insurance-payment codes form the best baseline around which to standardize the records) is not a sufficiently inventive concept, the Court concludes that the patents are drawn to an ineligible subject matter and that Defendants' motion should be granted.

2

The Court has carefully considered the parties' filings.   (Docket Nos. 185, 199,

203, 204, 205, 210, & 224.)   The Court has also taken judicial notice of the Court's file in

this case and considered the applicable Federal Rules of Civil Procedure, statutes, and

case law.   Now being fully informed, the Court makes the following findings of fact,

conclusions of law, and recommendation.

## Legal Standards

Defendants move for judgment on the pleadings under Federal Rule of Civil

Procedure 12(c).   Such motions are functionally identical to motions to dismiss for failure

to state a claim under Rule 12(b)(6).   *See Corder v. Lewis Palmer Sch. Dist. No. 38*, 566

F.3d 1219, 1223 (10th Cir. 2009).   Under Rule 12(b)(6) and Rule 12(c), a court considers

only the contents of the complaint—except that the court also considers documents

attached to the complaint (like Plaintiffs' patents), Fed. R. Civ. P. 10(c), and matters of

judicial notice, *Gee v. Pacheco,* 627 F.3d 1178, 1186 (10th Cir. 2010).   Facts are viewed

in the light most favorable to the plaintiff, and all reasonable inferences are drawn in the

plaintiff's favor.   *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"   *Ashcroft v. Iqbal,*

556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

Defendants' motion argues that the patents are invalid because they are not drawn

to patent-eligible subject matter under 35 U.S.C. § 101 (2012).   This is an affirmative

defense.   *Commil USA, LLC v. Cisco Sys., Inc.*, ___ U.S. ___, 2015 WL 2456617, at *9

3

(May 26, 2015).   Affirmative defenses can succeed under Rule 12(b)(6) or Rule 12(c) only if the well-pleaded factual allegations in the complaint, construed in the light most favorable to the plaintiff, establish the defense.   *See Jones v. Bock,* 549 U.S. 199, 215 (2007).

Invalidity under § 101 is a threshold question of law based only on the language of the patent claims.[1]   *See In re Bilski*, 545 F.3d 943, 950–51 (Fed. Cir. 2008), *aff'd, Bilski v. Kappos,* 561 U.S. 593 (2010).   Where those claims have required a construction by the court, the resulting *Markman* order controls the analysis.   *See, e.g.*, *TriPlay, Inc. v. WhatsApp Inc.*, 2015 WL 1927696, at *5–6 (D. Del. Apr. 28, 2015) (collecting 12(b)(6) cases resolved pre- and post-*Markman* order); *cf. In re Bilski*, 545 F.3d at 950–51 (claim construction and patent validity are related questions of law).

### The Patents-in-Suit

As summarized in Judge Blackburn's *Markman* order:

> This lawsuit involves the alleged infringement of ten patents, all of which relate, in broad terms, to a system for creating a patient-centric electronic healthcare record, or personal health record ("PHR").   The PHR is a comprehensive, unified medical record incorporating an individual patient's health-related information from diverse sources.   The innovation that underlies the patents-in-suit is that the health-related data is gleaned initially from claims submission records sent to and maintained by entities

---

[1]   It is true that invalidity depends on some predicate factual questions.   But since this is a Rule 12 motion—and all facts are taken as alleged in the complaint with all reasonable inferences drawn in Plaintiff's favor—there is no need for an evidentiary hearing.   *Cf. In re TLI Commc'ns LLC Patent Litig.*, ___ F. Supp. 3d ___, 2015 WL 627858, at *19 & nn.47–48 (E.D. Va. Feb. 6, 2015) (collecting cases, noting unsettled authority on standard of proof in § 101 challenges, and concluding that the standard is irrelevant because the issue is resolved on the patent language alone, without evidentiary disputes).   Plaintiff's request for a hearing is thus denied.

4

> that pay for healthcare, *e.g.*, health insurance providers.   The patents-in-suit describe a computer system and/or a method for extracting data from computer systems maintained by these payors, "normalizing" that information, and creating an integrated and comprehensive patient record that can be accessed by various persons and entities involved in the provision of healthcare to the patient.   This field of endeavor—which incorporates aspects of medicine, computer science, and information theory—is known as "healthcare informatics."

(Docket No. 136, pp. 3–4, *available at* 2014 WL 5473739, at *2 (D. Colo. Oct. 29, 2014)).

The *Markman* order construed a number of disputed terms, with the most critical decision being the construction of the words "normalized" and "normalizing," as they appear in the terms "normalized format" and "normalized data."   Judge Blackburn rejected the testimony of a pair of unhelpful experts, and adopted the definitions from the claims themselves:

> [A] "normalized format" is one "that displays health care data from one of more sources associated with a single patient such that any health care data associated with that patient having the same meaning is expressed in the same format despite any prior formatting."   "Normalized data" is data that has been converted to the "normalized format," which may then be transferred over a data network to a participant computer system.   The system "normalizes" the data when it undertakes this process.

(Docket No. 136, p. 14, 2014 WL 5473739, at *6).   Finally, Judge Blackburn defined the term "Personal Health Record(s)": "a comprehensive, patient-centric record of health-related information for a patient regardless of the specific healthcare provider[,] containing information that may be collected from diverse sources."   (Docket No. 136, p. 18, 2014 WL 5473739, at *8).

The core concept behind Plaintiff's patents-in-suit is that payor data (from insurance companies or government payors) provides the largest standardized code

around which disparate records can be harmonized with each other—or, in the language of the patents, normalized for the creation of a Personal Health Record ("PHR").

## Discussion

Section 101 of the Patent Act defines the subject matter eligible for patent protection.   The Supreme Court has long held that § 101 "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. ___, 134 S. Ct. 2347, 2354 (2014) (internal quotation marks omitted).   This judicially-created exception guards against patents that would monopolize the basic tools of innovation.   *Id.*   That said, courts must "tread carefully," because "[a]t some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas."   *Id.* (internal quotation marks and ellipses omitted).   Thus, courts "must distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more, thereby transforming them into a patent-eligible invention."   *Id.* (internal citations, quotation marks, and alterations omitted).

"In *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. ___, [132 S.Ct. 1289] (2012), [the Supreme Court] set forth a framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts."   *Alice Corp. Pty.*, 573 U.S. at ___, 134 S. Ct. at 2354.   First, courts must "determine whether the claims at issue are directed to one of those patent-ineligible concepts."   *Id.*   If the answer is "yes," courts

must then ask: "'[w]hat else is there in the claims before us?'"   *Id.*   In answering that question, courts must "consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application."   *Id.* (internal quotation marks omitted).

## I.   Step One: Whether The Patents Are Drawn To An Abstract Idea

An idea is abstract if it has "no particular concrete or tangible form."   *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014).   Likewise, a "method that can be performed by human thought alone" is an abstract idea.   *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011).   An abstract idea might be a "preexisting, fundamental truth" like a mathematical equation, or even a "method of organizing human activity" or "longstanding commercial practice," like hedging risk or using intermediaries to settle transactions.   *Alice Corp. Pty.*, 134 S.Ct. at 2356.

Defendants argue that Plaintiff's patents protect an abstract idea: "collecting and organizing information into a single record," for the patents whose claims focus on forming PHRs (Docket No. 185, p.6), or "unifying records from multiple sources," for the patents whose claims focus on normalizing data (*id.*, p.8).   Plaintiff's preferred explication of the patents' subject matter is longer, quoting from Judge Blackburn's *Markman* order:

> creating a PHR means creating "a comprehensive, patient-centric record of health-related information for a patient regardless of the specific healthcare provider containing information that may be collected from diverse sources," normalized by "having any healthcare data associated with a given patient having the same meaning expressed in the same format despite any prior formatting."

(Docket No. 199, p.6 (quoting Docket No. 136, pp. 14 & 18).)

Although the Supreme Court has warned against construing the subject matter underlying a patent at an unduly high level of generality, it is also true that the Supreme Court looks past the technical language of the patent to discern the true nature of the claim. *E.g.*, *Alice Corp. Pty.*, 134 S.Ct. at 2352, 2355–57 (where claim described computer process creating shadow account ledgers mirroring the account balances of the parties to a transaction, updating those ledgers in real time, and issuing irrevocable instructions for clearing transactions, all in order to limit risk of one party failing to perform at settlement, the claims were drawn to the abstract "concept of intermediated settlement, *i.e.*, the use of a third party to mitigate settlement risk"); *see also In re TLI Commc'ns LLC Patent Litig.*, ___ F. Supp. 3d ___, 2015 WL 627858, at *6 (E.D. Va. Feb. 6, 2015) ("In determining whether an idea in a software patent is abstract, courts must be careful to avoid allowing the typically convoluted claim language—"patent-ese"—to obfuscate the general purpose and real essence of software patent claims."). Looking through Plaintiff's verbosity, the underlying purpose of the patent claims[2] is clear: it's about combining and organizing records from various sources. Recordkeeping (even

---

[2] Under Federal Circuit precedent, the Court can resolve this case by looking to representative claims, so long as the all the claims are substantially similar and the differences between them would not change the analysis. *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348–49 (Fed. Cir. 2014). The Court has examined all of the patent claims—between the 10 patents, there are 48 independent claims and 449 dependent claims, for a total of 497 claims—and found no material distinctions. The representative claims the Court has relied upon are appended to this recommendation. In coming to this conclusion, the Court has considered Plaintiff's sur-reply, and therefore grants Plaintiff's motion for leave to file that sur-reply.

complicated recordkeeping) is no less a fundamental business practice or way of organizing human conduct than intermediating settlement or hedging risk, and it is therefore an abstract idea.   *See, e.g.*, *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 56 F. Supp. 3d 813 (E.D. Va. 2014) (four patents, all related to compiling, merging, and organizing network usage and accounting records from multiple sources, were drawn to abstract idea).

Plaintiff's arguments to the contrary rely on the complexity of the task.   Plaintiff argues, for example, that the patent does not describe merely "collecting and organizing information in a single record," but rather:

> (*i*) extraction from payor claims databases (a never charted source); (*ii*) transformation of data from semantically and syntactically disparate formats through rules engine normalization; (*iii*) application of predetermined rules to determine what data to keep and how to arrange it (a remodeling never before done with health records); (*iv*) complete reorganization of the now common formatted data by use of medical codes (a new idea involving 350,000 health care concepts); (*v*) creation of a comprehensive, longitudinal health record (never seen before); and (*vi*) populating website screens with the organized and analyzed data.

(Docket No. 199, p.9.)   But breaking the abstract idea down into constituent steps does not change the abstract nature of the idea—after all, the intermediated settlement process at issue in *Alice Corporation* had many constituent steps, and it was nonetheless abstract.   *Alice Corp. Pty.*, 134 S.Ct. at 2352 (describing steps to be taken by intermediating computer); *see also Ultramercial, Inc.,* 772 F.3d at 714–15 (eleven-step interactive process for delivering web ads as consideration for access to copyrighted material "describes only the abstract idea of showing an advertisement before delivering free content").

9

In the same vein, Plaintiff highlights the volume of medical records to which its system applies—noting that Defendant Aetna alone has over 36 million indexed entries in its records, and that normalization is based on an index of over 350,000 coded health care concepts.   (Docket No. 199, p. 11 & 13 n.9.)   But this argument also does nothing to distinguish this case from *Alice Corporation*, where the intermediated-settlement software could have been applied to a theoretically limitless number of financial transactions.   And while an inventive way of handling volume might be relevant at the second step of analysis under *Mayo*, the size and complexity of the task has no discernable relevance to whether the underlying concept itself is abstract.   In *CyberSource Corp.*, for example, the Federal Circuit addressed a patent for "mapping" credit-card transactions to IP addresses or e-mail addresses as part of a fraud-protection system.   654 F.3d at 1370–73.   Despite the obvious volume and complexity of such a task, the Federal Circuit still described it as one "that can be performed by human thought alone" and therefore an "abstract idea" within the meaning of *Mayo*.

At bottom, Plaintiff's patents describe an insightful method of compiling and organizing medical records.   This is "an abstraction—an idea, having no particular concrete or tangible form."   *Ultramercial, Inc.*, 772 F.3d at 715.   The Court must therefore proceed to the second step of *Mayo* analysis.

## II.    Step Two: Whether The Claims Amount To Significantly More Than The Abstract Idea Itself

The Supreme Court describes the second step of the *Mayo* analysis "as a search for an inventive concept—*i.e.,* an element or combination of elements that is sufficient to

ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice Corp. Pty.*, 573 U.S. at ___, 134 S. Ct. at 2354 (internal quotation marks and alteration omitted). "Simply appending conventional steps, specified at a high level of generality, [i]s not *enough* to supply an inventive concept." *Id.* at ___, 134 S. Ct. at 2357 (internal quotation marks omitted; emphasis in original). Moreover, it is also not "enough" to figure out a way to apply an abstract idea using a regular computer. *Id.* at ___, 134 S. Ct. at 2358.

### A.    Finding Meaningful Guidance

Commentators have criticized *Alice Corporation* for failing to provide any real guidance as to what is "enough" to be a sufficiently innovative concept.[3]   But it is possible to tease out some guidance from other cases.   For example, two Federal Circuit cases dealing with materially identical digital image-processing innovations came to opposite conclusions—and the U.S. Patent & Trademark Office ("PTO") has relied on stylized versions of those two cases as part of its guidance for applying *Alice Corporation*.

The first case is *Research Corporation Technologies, Inc. v. Microsoft Corporation*, 627 F.3d 859 (Fed. Cir. 2010).   The patent at issue described a new process for "halftoning" digital images—applying a mathematical "mask" that converts the pixel information of the source image file into a different set of pixels usable by the printer

---

[3]  *See, e.g.*, John Duffy, *Opinion analysis: The uncertain expansion of judge-made exceptions to patentability*, SCOTUSBLOG (Jun. 20, 2014, 12:46 PM), *available at* http://bit.ly/T3yEcF ("I'll have to teach this 'enough' test next semester.   I'll be sure to use italics, just like the Court did, but I'm not convinced that even with the different font, the *enough* test will give much guidance to my students, or to the lawyers, judges and Patent Office officials who will have to apply it to numerous other situations.").

or monitor being used to view the image (for example, converting a gray-scale image into a black-and-white iteration that gives the appearance of shades of gray). *Id.* at 862–65. Applying a looser pre-*Mayo* analysis, the Federal Circuit found that the patent was not drawn to an abstract idea. *Id.* 868. But it went on to discuss the analogue to *Mayo*'s second step: the application of the patent's core innovation. *Id.* at 868–69. It is that secondary analysis that the PTO highlighted in its post-*Alice Corporation* guidance and associated examples, using the case as an example of patent-eligible subject matter. *See* 2014 Interim Guidance on Patent Subject Matter Eligibility, 79 Fed. Reg. 74,618, 74,630 (Dec. 16, 2014); U.S. Patent and Trademark Office, *Examples: Abstract Ideas*, at 7–10 (Jan. 27, 2015), *available at* http://1.usa.gov/1H5CZ5w. The Federal Circuit reasoned that the patent protected not simply the mathematical algorithms for creating the image "mask," but also the process for "rendering a halftone image of a digital image by comparing, pixel by pixel, the digital image against [the] mask." *Research Corp. Techs, Inc.*, 627 F.3d at 868. Thus, the patent protected not just the improved math, but the improved math as applied at various steps within a process for modifying the data and rendering an image. Because the language of the claim limited the patent to a very specific process within an equally specific technical field—rather than all conceivable applications of the mathematical innovation—the claim described more than just the abstract idea itself.

The second case is *Digitech Image Technologies, LLC v. Electronics for Imaging, Inc.*, 758 F.3d 1344 (Fed. Cir. 2014). The patent at issue described a new process for

12

compensating for the distortions inherent in transferring a digital image from the

image-taking tool (*e.g.*, a digital camera) to the image-rendering tool (*e.g.*, a printer or

monitor)—applying novel algorithms that compensated for color distortions as previously

known to the art, but for first time also compensated for spatial distortions.   *Id.* at 1347–

48.   Here, the Federal Circuit found that the patent was drawn to an abstract idea, and

that there was no inventive concept transforming the subject matter of the patent into

more than just the mathematical idea.   *Id.* at 1350–51.   The PTO included this case in

the same guidance, this time as an example of non-eligible subject matter.   *See* 2014

Interim Guidance on Patent Subject Matter Eligibility, 79 Fed. Reg. at 74,631; U.S. Patent

and Trademark Office, *Examples: Abstract Ideas*, at 13–15.

    *Digitech Image*, like *Research Corporation*, involved digital-image technology

improved by an abstract mathematical innovation.   Unlike *Research Corporation*,

however, the patent claim in *Digitech Image* failed to describe any specific process

beyond gathering data and applying the math to that data.   As the Federal Circuit

explained:

> . . . The [*Digitech*] claim recites a process of taking two data sets and
> combining them into a single data set . . . .   The two data sets are
> generated by taking existing information . . . and organizing this information
> into a new form.   The above claim thus recites an ineligible abstract
> process of gathering and combining data that does not require input from a
> physical device. . . . .   Without additional limitations, a process that
> employs mathematical algorithms to manipulate existing information to
> general additional information is not patent eligible. . . .
>
> Contrary to Digitech's argument, nothing in the claim language expressly
> ties the method to an image processor.   The claim generically recites a
> process of combining two data sets into a device profile; it does not claim

> the processor's use of that profile in the capturing, transforming, or
> rendering of the digital image.

*Digitech Image Techs., LLC*, 758 F.3d at 1351.   Thus, the apparent distinction between

*Research Corporation* and *Digitech Image* is that the former drew its patent to a

mathematical innovation housed within a very specific and narrow technical process (and

equipment), whereas the latter drew its patent to the mathematical innovation

itself—describing the relevant process in very general terms that did not meaningfully limit

the patent to specific applications of the innovation.   *See also* U.S. Patent and

Trademark Office, *Examples: Abstract Ideas* 15 ("[T]he claimed method simply described

the concept of gathering and combining data by reciting steps of organizing information

through mathematical relationships.").

These two cases, and the PTO's guidance relying on them, suggest that the

"inventive concept" required in *Mayo*'s second step has more to do with limiting the

patent's preemptive scope as it does with the actual innovation.   And this is not

surprising: the stated purpose of the test is to prevent the patent from monopolizing the

"ineligible concept itself."   *Alice Corp. Pty.*, 573 U.S. at ___, 134 S. Ct. at 2354.

Likewise, although the Supreme Court has described the second *Mayo* step "as a search

for an inventive concept," it is emphatically *not* a search for novelty, a question raised

instead under 35 U.S.C. § 102.   *Diamond v. Diehr,* 450 U.S. 175, 190, 101 S.Ct. 1048,

67 L.Ed.2d 155 (1981) ("The question therefore of whether a particular invention is novel

is wholly apart from whether the invention falls into a category of statutory subject matter."

(internal quotation marks and citations omitted)); *see also Bilski v. Kappos*, 561 U.S. 593,

624 (2010) (Stevens, J., concurring) ("Given the many moving parts at work in the Patent

Act, there is a risk of merely confirming our preconceived notions of what should be

patentable or of seeing common attributes that track the familiar issues of novelty and

obviousness that arise under other sections of the statute but are not relevant to § 101."

(internal quotation marks omitted)).   In searching for "an inventive concept," then, courts

are to focus on whether the claimed application is something more than just a generic

application the abstract idea itself—and not on related concepts that arise later in the

patent-validity analysis, like novelty or non-obviousness.   *In re TLI Commc'ns LLC*

*Patent Litig.*, ___ F. Supp. 3d ___, 2015 WL 627858, at *6.

### B.   Applying the Guidance

Applying this rule, Plaintiff's patents do not come close to passing the test.   The

patent claims describe nothing more than highly general processes for applying Plaintiff's

creative insight (which, again, is that insurance codes form excellent indexes for

organizing and merging disparate medical records).   The process involves indexing,

matching, and reformatting the records, but nothing less generic than that.   Indeed,

Plaintiff's briefing in this Court all but confesses that Plaintiff seeks to patent that insight,

rather than any process through which the idea is applied:

> HealthTrio's claims are well-tethered in technological limitations that rely in
> the first instance on payor claims data, and then apply normalization and
> remodeling techniques to health-related data.   Thus, Defendants'
> preemption concern is inapt.   *They are free to mine from, and apply their*
> *own techniques to, any non-health field, and to the many other available*
> *sources of health information: patient files, provider charts, personal*
> *performance bracelets, and the ever expanding universe of online*
> *databases.*

15

(Docket No. 19, at 13–14 (emphasis added).)   Plaintiff seeks not to preempt some

specific technical process applying its creative idea, but rather the very idea itself.   This

is ineligible subject matter under § 101.

Plaintiff's arguments to the contrary are unavailing.   First, Plaintiff argues that

second step of the *Mayo* analysis requires looking for steps that are not "routine" or

"conventional" in the industry—and that such inquiries are factual questions, to be

resolved in Plaintiff's favor based on the pleadings.   Relatedly, Plaintiff argues that the

idea at issue—compiling medical records from various sources into one patient-centric

record—was not a routine or conventional business practice at the time of the patent

applications.   But these arguments miss the mark.   Certainly, *Mayo* used the words

"routine" and "conventional" to explain why the patent at issue in that case was not

sufficiently different from the underlying laws of nature it was drawn to.   *Mayo*

*Collaborative Servs.*, 566 U.S. at ___, 132 S. Ct. at 1299.   But Plaintiff puts too much

weight on those words and thereby conflates the inquiry with the novelty test under § 102.

After all, the digital-imaging patent at issue in *Research Corporation* did not apply its

mathematical innovation in a previously unknown process; the process of applying a

mask to image pixels was already well-known.   *See* 627 F.3d at 863.   The *application* of

the innovative algorithms did not add anything novel—but it did place meaningful limits on

the scope of the patent's preemptive claim over the algorithms, and therefore transformed

the claim into patent eligible subject matter.   Here, Plaintiff focuses on the novelty of

using insurance coding as a tool for combining and normalizing disparate medical

16

records—and by focusing on the wrong question, Plaintiff fails to show how its claims put any meaningful limits on the scope of its preemptive claims.

Plaintiff does address the right question when it lists out the constituent steps of its process, as discussed above.[4]   Those steps, again, are:

> (*i*) extraction from payor claims databases (a never charted source); (*ii*) transformation of data from semantically and syntactically disparate formats through rules engine normalization; (*iii*) application of predetermined rules to determine what data to keep and how to arrange it (a remodeling never before done with health records); (*iv*) complete reorganization of the now common formatted data by use of medical codes (a new idea involving 350,000 health care concepts); (*v*) creation of a comprehensive, longitudinal health record (never seen before); and (*vi*) populating website screens with the organized and analyzed data.

(Docket No. 199, p.9.)   But these steps, perhaps aside from the reference to "rules engine normalization," are exactly what *Mayo* warns against.   "[S]imply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable."   *Mayo Collaborative Servs.*, 566 U.S. at ___, 132 S. Ct. at 1300.   These steps are specified at such a high level of generality that they describe virtually any attempt at organizing and consolidating medical records electronically, provided the attempt begins by looking at insurance records.   Which is to say: they describe virtually any attempt at this abstract idea, provided it begins with Plaintiff's insight as to how best to effectuate it.   This is not "*enough*" to "amount[] to significantly more than a patent upon the ineligible concept itself."   *Alice Corp. Pty.*, 573 U.S. at ___, 134 S. Ct. at 2354.

---

[4] Plaintiff does not identify whether this step-by-step process is relevant to the first step of the *Mayo* analysis, or the second.   The Court therefore addresses it at both steps.

The reference to a "rules engine" does not save the claims, either.   The rules engine is nothing more than a set of functions, applied to the data.   The functions may or may not be innovative—but either way, the "rules engine" is simply a manifestation of the abstract idea itself.   *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) ("[T]the claims of the asserted patents are drawn to the abstract idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory.   The concept of data collection, recognition, and storage is undisputedly well-known. Indeed, humans have always performed these functions."); *Cf. Cyberfone Sys., LLC v. CNN Interactive Group, Inc.,* 558 F. App'x 988, 992 (Fed. Cir. 2014) ("[The] well-known concept of categorical data storage, *i.e.,* the idea of collecting information in classified form, then separating and transmitting that information according to its classification is an abstract idea that is not patent eligible."); *Enfish, LLC v. Microsoft Corp.*, 56 F. Supp. 3d 1167, 1177–78 (C.D. Cal. 2014) ("Likewise, the limitation of 'indexing data stored in said table' is not an inventive concept. . . .   A bare recitation of an indexing limitation does not make this abstract idea patentable.").

Next, Plaintiff cites *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014), for the argument that its patents are "'rooted in computer technology' that did not and could not have existed in the pre-computer, pre-Internet world.   (Docket No. 188, p.7.) But in *DDR Holdings*, the patent at issue interrupted internet traffic so that a website could host third-party sales without diverting its own traffic to that third party.   *DDR Holdings, LLC*, 773 F.3d at 1249–50.   Unlike the patent at issue here, the *DDR Holdings* patents could

not fairly be defined at such a high level of generality that they could be called an abstract idea; rather, the Federal Circuit held that the claims did not recite a "fundamental economic or longstanding commercial practice," and even though the patent claimed to solve a business challenge, it was a "challenge particular to the Internet." *Id.* at 1257. The same cannot be said of this case. The problem of organizing and rationalizing incongruent records is an ancient issue, long predating computers.

Finally, Plaintiff cites the Federal Circuit's "machine or transformation" test, *Ultramercial, Inc.*, 772 F.3d at 716, arguing that the creation of new, normalized data (*i.e.*, the PHR) from other records constitutes a transformation. But the Federal Circuit also holds that combining records into one record is insufficient under *Mayo*. *Content Extraction*, 776 F.3d at 1347–49. Doing so in a way that can be displayed on a computer cannot compel a different result. *See* 573 U.S. at ___, 134 S. Ct. at 2358.

### C.    Conclusion

The Court concludes that, under the *Mayo* test, Plaintiff's patents are drawn in ineligible subject matter.

19

## Recommendation

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendants'

Motion for Judgment on the Pleadings **(Docket No. 185) be GRANTED** and that

judgment be entered for Defendants and against Plaintiff, with costs taxed against

Plaintiff pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1

## Order

It is also **ORDERED** that Plaintiff's Motion for Leave to File a Sur-Reply to

Defendants' Reply in Support of their Motion for Judgment on the Pleadings **(Docket No.**

**205) is GRANTED**.

**NOTICE:   Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case.   A party may respond to another party's objections within fourteen (14) days after being served with a copy.   The District Judge need not consider frivolous, conclusive, or general objections.   A party's failure to file and serve such written, specific objections waives de novo review of the recommendation by the District Judge, Thomas v. Arn, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions, Makin v. Colo. Dep't of Corr., 183 F.3d 1205, 1210 (10th Cir. 1999); Talley v. Hesse, 91 F.3d 1411, 1412-13 (10th Cir. 1996).**

Dated:        June 17, 2015              _/s/ Michael J. Watanabe_____
              Denver, Colorado           Michael J. Watanabe
                                         United States Magistrate Judge

20

## **Appendix**

The '234 Patent's Claims

**1.** An electronic health record system server for use with a patient enrolled in a health plan of a payor, wherein the health plan covers at least a portion of the cost of the patient when a patient undergoes encounters with a plurality of health care providers regarding a health related issue of the patient, wherein under the plan the health care providers request payment for at least a portion of the cost for the encounters from the payor, wherein the plan requires the health care providers to submit health related information of the patient to the payor to support the cost of encounters with the patient, the electronic health record system server comprising:

> a memory for storing instructions and data associated with an electronic health record of the patient; and

> a processor configured to execute the instructions, wherein the instructions cause the processor to perform the steps comprising:

>> (a) transferring payor claims data of the patient to the electronic health record system server;

>> (b) analyzing said payor claims data to determine which portion of said payor claims data concerning the patient is encounter data comprising at least one of a diagnosis or a treatment or a medication or a procedure or a history of office visits of the patient with one or more of the health care providers;

>> (c) populating the electronic health record of the patient by storing one or more entries into the electronic health record of the patient based on the encounter data, wherein population of at least a portion of the entries in the electronic health record of the patient is encounter data extracted from the payor claims data;

>> (d) organizing the electronic health record by associating together one or more entries in the electronic health record of the patient that are related; and

>> (e) providing electronic access to at least one health care provider of the patient to view the electronic health record of the patient.

**2.** The system of claim **1,** further comprising an instruction for providing the health care provider of the patient with electronic access to supplement the electronic health record the patient.

**3.** The system of claim **1,** further comprising an instruction for presenting the health care provider with an electronic interface to order one or more tests for the patient over a communications network.

**4.** The system of claim **1,** further comprising an instruction for presenting the health care provider with an electronic interface to order one or more treatments for the patient over a communications network.

**5.** The system of claim **1,** further comprising an instruction for present the health care provider with an electronic interface to order one or more prescriptions for the patient over a communications network.

**6.** The system of claim **1,** further comprising an instruction for providing a messaging facility for supplementing the electronic health record of the patient with health related data comprising one or more of laboratory data, imaging data, med1catJon data, or ancillary test data.

**7.** The system of claim **1,** further comprising an instruction for providing a messaging facility for supplementing the electronic health record of the patient with health related data comprising one or more of laboratory data, imaging data, medication data, or ancillary test data.

**8.** The system of claim **1,** further comprising an instruction for providing a web-based portal accessible by the patient to v1ew the electronic health record of the patient.

**9.** The system of claim **8,** wherein the web-based portal is configured to allow the patient to supplement the electronic health record of the patient.

**10.** The system of claim **8,** wherein the web-based portal prompts the patient to supplement the electronic health record with one or more of over-the-counter medications of the patient, allergies of the patient, or immunizations of the patient.

**11.** The system of claim **8,** wherein access to the electronic health record is granted based on selections from the patient via the web-based portal.

**12.** The system of claim **8,** wherein the web-based portal is configured to present a list of possible restricted areas in the electronic health record to the patient and create at least one access list responsive to selections of the patient on the web-based portal based on the list of possible restricted areas.

**13.** The system of claim **12,** wherein the list of possible restricted areas is one or more of reproductive health, genetic testing, abortion, sexually transmitted diseases, alcohol abuse, drug abuse, AIDS, contraceptive issues abuse neglect, or sexual assault.

22

**14.** The system of claim **1,** further comprising an instruction for identifying patterns or relationships in the electronic health record of the patient.

**15.** A personal health record ("PHR") system server for use with a patient enrolled in a health plan of a payor, wherein the when a patient undergoes encounters with a plurality of health care providers regarding a health related issue of the patient, wherein under the plan the health care providers request payment for at least a portion of the cost for the encounters from the payor, wherein the plan requires the health care providers to submit health related information of the patient to the payor to support the cost of encounters with the patient, the PHR system server comprising:

a memory for storing instructions and data associated with a personal/individual health record of the patient; and

a processor configured to execute the instructions, wherein the instructions cause the processor to perform the steps comprising:

(a) transferring payor claims data of the patient to the ("PHR") system server;

(b) analyzing said payor claims data to determine which portion of said payor claims data concerning the pat1ent 1s encounter data comprising at least one of a diagnosis or a treatment or a medication or a procedure or a history of office visits of the patient with one or more of the health care providers;

(c) populating the personal/individual health record of the patient by storing one or more entries into the personal/individual health record of the patient based on the encounter data, wherein population of at least a portion of the entries in the personal/individual health record of the patient is encounter data extracted from the payor claims data;

(d) organizing the personal/individual health record by assoc1atmg together one or more entries in the personal/ individual health record of the patient that are related; and

(e) providing a web-based portal accessible by the patient to view the personal/individual health record of the patient.

**16.** The system of claim **15,** wherein the web-based portal is configured to allow the patient to supplement the electronic health record of the patient.

**17.** The system of claim **15,** wherein the web-based portal prompts the patient to supplement the personal/individual health record with one or more of over-the-counter

medications of the patient, allergies of the patient, or immunizations of the patient.

**18.** The system of claim **15,** wherein access to the personal/individual health record is granted based on selections from the patient via the web-based portal.

**19.** The system of claim **15,** wherein the web-based portal is configured to present a list of possible restricted areas in the electronic health record to the patient and create at least one access list responsive to selections of the patient on the web-based portal based on the list of possible restricted areas.

**20.** The system of claim **19,** wherein the list of possible restricted areas is at least one of reproductive health, genetic testing, abortion, sexually transmitted diseases, alcohol abuse, drug abuse, AIDS, contraceptive issues abuse neglect, or sexual assault.

## The '239 Patent's Claims

**1.** A computer system to process health care data from one or more health care records from one or more sources related to a patient in order to communicate that health care data between a health care provider and payor, the computer system comprising:

an intermediary computer configured to communicate with one or more databases that stores one or more health care records containing a plurality of health care data related to the patient;

wherein the databases are selected from a group consisting of a payor database and a provider database;

wherein the intermediary computer is configured to communicate with the plurality of health care data related to the patient of a type where each of the health care data is displayed in a separate field;

wherein any of the plurality of health care data related to the patient which are intended to have the same meaning, are expressed in either different formats, or have not previously been subject to a normalized format;

wherein the normalized format is of a type that displays health care data from one or more sources associated with a single patient such that any health care data associated with that patient having the same meaning is expressed in the same format despite any prior formatting;

a staging database that is part of the intermediary computer and that is configured to receive the plurality of selected health care data;

a rules engine that establishes the normalized format for health care data associated with the patient and predetermines how each of the plurality of selected health care data is to appear in its respective field to send to the participant;

wherein fields in the normalized format that correspond to the fields containing the health care data for the patient not expressed as predetermined by the normalized format is remodeled to be expressed as predetermined by the normalized format becoming normalized data; and

wherein the plurality of health care data related to the patient comprises claims data that is normalized into claims data in normalized format which is available to be transferred to the payor over a data network.

**2.** The computer system of claim 1, wherein the claims data in normalized format is transferrable to the payor to adjudicate the claim and remit payment.

**3.** The computer system of claim 1, wherein the claims data in normalized format is transferrable to the payor to adjudicate the claim and explain benefits.

**4.** The computer system of claim 1, wherein any invalid health care data is evaluated to make the invalid health care data useable.

**5.** The computer system of claim 1, wherein the intermediary computer is configured to determine whether any of the plurality of health care data is invalid and configured to transfer the invalid health care data to an invalid data database to be corrected.

**6.** A computer system to process health care data from one or more health care records from one or more sources related to a patient in order to communicate that health care data between a health care provider and payor, the computer system comprising:

an intermediary computer configured to communicate with one or more databases that stores one or more health care records containing a plurality of health care data related to the patient;

wherein the databases are selected from a group consisting of a payor database and a provider database;

wherein the intermediary computer is configured to communicate with the plurality of health care data related to the patient of a type where each of the health care data is displayed in a separate field;

wherein any of the plurality of health care data related to the patient which are intended to have the same meaning, are expressed in either different formats, or have not previously been subject to a normalized format;

wherein the normalized format is of a type that displays health care data from one or more sources associated with a single patient such that any health care data associated with that patient having the same meaning is expressed in the same format despite any prior formatting;

a rules engine that establishes the normalized format for health care data associated with the patient and predetermines how each of the plurality of selected health care data is to appear in its respective field to send to the participant;

wherein fields in the normalized format that correspond to the fields containing the health care data for the patient not expressed as predetermined by the normalized format is remodeled to be expressed as predetermined by the normalized format becoming normalized data; and

wherein the plurality of health care data related to the patient comprises claims data that is normalized into claims data in normalized format which is available to be transferred to the payor over a data network.

**7.** The computer system of claim 6, wherein the claims data in normalized format is transferrable to the payor to adjudicate the claim and remit payment.

**8.** The computer system of claim 6, wherein the claims data in normalized format is transferrable to the payor to adjudicate the claim and explain benefits.

**9.** The computer system of claim 6 wherein any invalid health care data is evaluated to make the invalid health care data useable.

**10.** The computer system of claim 6, wherein the intermediary computer is configured to determine whether any of the plurality of health care data is invalid and configured to transfer the invalid health care data to an invalid data database to be corrected.